# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 24-224V

|  |  |
|---|---|
| MARLENE CIVIS, | Chief Special Master Corcoran |
| Petitioner, | Filed: September 16, 2025 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Maximillian J. Muller, Muller Brazil, LLP, Dresher, PA,* for Petitioner.

*Christopher Pinto, U.S. Department of Justice, Washington, DC,* for Respondent.

## FINDINGS OF FACT[1]

On February 14, 2024, Marlene Civis filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges a Table claim – that she suffered a shoulder injury related to vaccine administration ("SIRVA") after receiving an influenza ("flu") vaccine on January 26, 2022. *Id.* The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

A disputed fact issue has arisen regarding whether Petitioner's injury meets the Act's severity requirement. For the reasons discussed below, I find it more likely than not that Petitioner can establish this claim element.

---

[1] Because this Fact Ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.    Relevant Procedural History

In October 2024, Respondent stated he had completed the medical review of this matter and would defend the claim. ECF No. 17. Respondent thereafter filed a Rule 4(c) Report (ECF No. 18), contending that Petitioner has not established that she suffered her alleged SIRVA for more than six months post-vaccination. *Id.* at 8. The issue of severity is ripe for consideration.

## II.    Relevant Authority

Pursuant to Section 13(a)(1)(A) of the Vaccine Act, a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117475, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed, or varied, by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## III.    Finding of Fact Regarding Severity

I make this finding after a complete review of the record to include all medical records, affidavits, and additional evidence filed, and in particular the following:[3]

- Petitioner received the subject flu vaccine in her left deltoid on January 26, 2022. Ex. 2 at 136-37.

- On February 9, 2022 (14 days post vaccination), Petitioner sent a message to her primary care provider ("PCP") complaining of upper arm soreness "after the flu shot 2 weeks ago." Ex. 2 at 131. She wrote that she did not "remember the soreness lasting this long before." *Id.* The treater

---

[3] While I have reviewed all the evidence filed to-date in this case, only evidence related to severity will be discussed herein, though other facts may be provided as necessary.

recommended ice, over-the-counter medications, and to seek in-person treatment if her symptoms did not improve. *Id.* at 130.

- Two weeks later, on February 28, 2022, Petitioner had a visit with her PCP for "arm pain x 2 weeks; intermittent pain in upper left arm that radiates down." Ex. 2 at 115. Although the PCP noted there was "no injury mechanism[,]" Petitioner's pain had "been fluctuating since the incident." *Id.* Petitioner described the pain as "aching, shooting and stabbing," that it "radiates to the left arm" and the forearm, was moderate in intensity, and rated at an 8/10. *Id.* The PCP assessed Petitioner with biceps tendinitis of the left upper extremity and prescribed an anti-inflammatory (Meloxicam), plus ice and rest for 10-14 days. *Id.* at 117.

- Petitioner sent another message to her PCP on April 7, 2022. Ex. 2 at 108. Petitioner inquired whether she could continue taking Meloxicam and other next steps, as her "arm still hurts when [she] stretch[es], moves the wrong way or sleep[s] on it." *Id.* She also noted she was still "icing it morning and night." *Id.* The PCP referred Petitioner to an orthopedist. *Id.* at 107.

- On April 18, 2022, Petitioner visited an orthopedist with a chief complaint of left arm pain. Ex. 3 at 31. Petitioner reported that the "[t]he problem started: flu shot, had normal movement and just sore for 2 weeks, then intense pain with any exertion." *Id.* Petitioner rated her pain at a 3/10, but an 8/10 at worst, and she described it as burning, aching, and worse with sleeping and activity. *Id.*

- Upon examination, Petitioner exhibited "slightly limited range of motion [("ROM")]" and limited strength. Ex. 3 at 32. An x-ray revealed no evidence of fractures, dislocations or osteoarthritis. *Id.* The orthopedist's assessment was "suspected left shoulder bursitis following flu shot administration" and Petitioner received a steroid injection in the left shoulder; the orthopedist also told Petitioner to continue taking Meloxicam, icing the area, and to seek treatment with PT. *Id.*

- Later that month, Petitioner attended her first PT visit on April 26, 2022. Ex. 3 at 25. She reported that she "had a flu shot at the end of January and her pain started a couple of weeks after that." *Id.* Petitioner stated that she "had an injection which helped" and she now had "minimal pain since the injection but the shoulder feels weak and tight[;]" specifically, she was "afraid to use the arm for [activities of daily living ("ADLs")]." *Id.* Petitioner rated her current pain at a 0/10 but a 2/10 at worst since the injection (and

4

an 8/10 before the injection). *Id.* A physical examination showed diminished ROM and strength (consistent with impingement/bursitis), and six weeks of PT was recommended. *Id.* at 26-27.

- During Petitioner's second PT visit on May 3, 2022, she reported a "decrease in symptoms since [her] last visit" but that she "still has some tightness with overhead reach and intermittent impingement symptoms." Ex. 3 at 23. On May 13, 2022 (during her third PT visit), Petitioner reported that she "felt good after last [treatment] session, but tried to perform her [home exercise program ("HEP")] and had pain w/ prone Ts [sic], and skipped them due to exacerbation of [symptoms]." *Id.* at 21.

- Petitioner followed up with her orthopedist on June 6, 2022. Ex. 3 at 37. She noted that she had "some discomfort. A cortisone injection did help her slightly and temporarily." *Id.* However, the "pain can sometimes get to an 8/10 with certain maneuvers." *Id.* The orthopedist's assessment was "[s]uspected left shoulder bursitis versus development adhesive capsulitis following flu shot administration." *Id.* at 38. The orthopedist recommended an MRI and told Petitioner to return for management options following said imaging. *Id.*

- On June 9, 2022, Petitioner's orthopedist reviewed with her the results of her recent MRI and noted the impression as adhesive capsulitis, mild subacromial/subdeltoid bursitis, no discrete rotator cuff tear but edema at the myotendinous junction of the infraspinatus, "which may indicate a grade 1 strain, versus changes related to a recent injection[,]" and posterior and lateral acromial down-sloping. Ex. 3 at 40.

- Petitioner followed up with her orthopedist on June 17, 2022, and stated she "had very temporary relief following a subacromial injection[.]" Ex. 3 at 34. However, she exhibited decreased ROM and normal strength. *Id.* at 35. The orthopedist's assessment was "[s]uspected left adhesive capsulitis following flu shot administration." *Id.* The orthopedist administered Petitioner another steroid injection, instructed her to continue PT and Meloxicam, and told her to "check back in 2 months [or in August 2022] to monitor her progress." *Id.* at 35-36.

- At Petitioner's June 28th PT visit, Petitioner noted she was "feeling progress" since her second steroid injection. Ex. 3 at 17. She rated her current pain at a 0/10 but a 5/10 at worst since the injection. *Id.* Petitioner described pain

with dressing and mild limitations with reaching overhead, lifting, and occupational activities. *Id.*

- On July 25, 2022 (approximately five months and 29 days post vaccination), Petitioner attended her eighth and final PT session. Ex. 3 at 8. Petitioner reported she was "pleased with her progress with L shoulder ROM but she reports L shoulder weakness with lifting ADLs at home." *Id.* She rated her pain at a 0/10. *Id.* at 9. A number of PT goals were listed as "not met" including improving her ROM and reaching overhead into kitchen cabinets without aggravation. *See id.* at 8. An examination showed diminished ROM in the left shoulder. *Id.* at 9. The plan was to continue with PT. *Id.* at 10.

- Despite the plan to continue with PT, on August 25, 2022 – thus past the six-month "cut-off" – Petitioner cancelled her PT sessions and did not return thereafter. *See* Ex. 3 at 7.

- Petitioner had PCP visits on December 1, 2022, and January 12, 2023, during which she did not mention ongoing left shoulder symptoms. *See,* e.g., Ex. 2 at 73-74, 91-92.

- Approximately nine-and-a-half months since her last visit for shoulder-related issues, on May 10, 2023, Petitioner returned to care with an orthopedic surgeon for left shoulder concerns. Ex. 4 at 26. She reported "ongoing pain and discomfort in her left shoulder since she had COVID-19 and then a flu vaccine injections [sic] given approximately 3 weeks apart." *Id.* Petitioner also described "numbness and tingling to her hand, which is very painful[,]" plus neck pain. *Id.* She noted that her previous steroid injections "gave her no relief" and that she had "never had an MRI." *Id.* An examination showed signs of a herniated disc, partial rotator cuff tear, biceps labral syndrome, subacromial bursitis, and AC joint arthritis. *Id.* at 26-27. Petitioner received another steroid injection in the left shoulder. *Id.* at 27.

- Later that month, on May 31, 2023, Petitioner followed up with her orthopedic surgeon and to review her repeat left shoulder MRI. Ex. 4 at 19-20. The treater felt that the MRI showed "anterior supraspinatus partial thickness tear, nondisplaced type II SLAP tear, significant subacromial bursitis, adhesive capsulitis, and AC joint arthritis." *Id.* at 19. The treater also noted that he felt "the vaccines are the cause or reason she is now suffering and needs further work-up." *Id.* at 20. She received additional left arm

treatment thereafter throughout at least October 2023. *See,* e.g., *id.* at 13-14, 16-17.

- In her declaration, authored on February 13, 2024, Petitioner explains that "[a]fter months of orthopedic treatment [her ROM] was returning, and the pain became tolerable." Ex. 5 ¶ 9. She therefore "ceased doctor visits and [PT] because it was becoming expensive." *Id.* Petitioner attests that she "continued to have left shoulder pain after [she] stopped PT in August of 2022." *Id.*

## ANALYSIS

The Vaccine Act requires that a Petitioner demonstrate that "residual effects or complications" of a vaccine related injury continued for more than six months. Vaccine Act § 11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. § 13(a)(1)(A). To satisfy the six-month requirement, "[a] potential petitioner must do something more than merely submit a petition and an affidavit parroting the words of the statute." *Faup v. Sec'y of Health & Hum. Servs.,* No. 12-87V, 2015 WL 443802, at *4 (Fed. Cl. Spec. Mstr. Jan. 13, 2015). Rather, a petitioner is required to "submit supporting documentation which reasonably demonstrates that the alleged injury or its sequelae lasted more than six months[.]" *Id.*

Additionally, "the fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Hum. Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Hum. Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) (finding that a petitioner suffered from residual symptoms that due to their mild nature did not require medical care and thus that "a discharge from medical care does not necessarily indicate there are no residual effects"). In another SPU case, where a petitioner's last treatment was at five months and nine days, the petitioner was found to meet the six-month requirement. *Schafer v. Sec'y of Health & Hum. Servs.*, No. 16-0593V, 2019 WL 5849524 (Fed. Cl. Spec. Mstr. Aug. 28, 2019). In that case, based on the petitioner's symptomology and progression, the special master noted that it was unlikely "that petitioner's shoulder symptoms would have resolved within [the next] 22 days." *Id.* at *7.

In this case, there appears to be no dispute that Petitioner received the flu vaccine on January 26, 2022, and although not disputed (but not otherwise conceded) by Respondent in his Rule 4(c) Report, I will *assume arguendo* that the onset of her post-vaccination shoulder symptoms occurred within 48 hours of the subject vaccination. *See*

*generally* ECF No. 18 at 9-10. She therefore must demonstrate by preponderant evidence that her residual symptoms continued for more than six months thereafter from onset, or through July 28, 2022 (at the latest). *See,* e.g., *Herren,* 2014 WL 3889070, at *3.

The records discussed above establish that on July 25, 2022 (merely *one-to-three days* shy of any possible severity "cut-off" date), while Petitioner rated her current pain at a 0/10 and reported she was "pleased with her progress," she nevertheless exhibited diminished ROM in the left shoulder compared to the right, and difficulty with ADLs, including lifting and reaching overhead on examination. Ex. 3 at 8-9. Accordingly, additional PT was recommended to address these ongoing symptoms. *Id.* at 10.

Such record notations, paired with a proposed continued treatment course, provide evidence that Petitioner's injury was at this point likely ongoing, and that her treating physician did not predict that the injury was likely to resolve soon thereafter – let alone within the next three days. *See,* e.g., *Schafer*, 2019 WL 5849524, at *7.

I also do not construe Petitioner's cessation (or at least pause) of treatment after July 2022 as evidence that her injury had resolved by that time. Rather, Petitioner's treatment cessation has a reasonable explanation (that she had reached a point in her treatment course where her pain was tolerable, and she therefore did not want to incur additional costs as her treatment was becoming expensive). *See* Ex. 5 ¶ 9. While Petitioner did obtain treatment during the subsequent lengthy gap for non-shoulder related issues, I do not conclude from this that her alleged SIRVA had likely resolved fully by late July 2022.

Compared to other SIRVA injuries, however, Petitioner's left shoulder pain and limited ROM was not especially severe, even at the time she did obtain treatment. And significantly, she did not seek follow up care after July 2022 for more than nine months.[4] All of this speaks to the likely mildness of Petitioner's symptoms[5] – but that is a matter that goes to the ultimate quantum of damages to be paid, rather than whether the claim's temporal severity has been established.

---

[4] Indeed, Petitioner's care after this time included treatment outside of the vaccinated shoulder, including a May 22, 2023 visit (following an MRI of the cervical spine), during which another orthopedic surgeon opined that Petitioner had "minor cervical disc degeneration without stenosis" and "nonspecific tingling intermittently, mechanical in the forearm that does not correlate at all with anything in her neck, possible peripheral neuropathy." Ex. 4 at 22-23. There is thus a reasonable question regarding whether all of Petitioner's post-gap care was related to the subject vaccination. Petitioner should not necessarily expect to receive full damages for treatment obtained after the lengthy gap.

[5] For this reason, Petitioner should also anticipate a modest pain and suffering award.

**Scheduling Order**

**Respondent shall file, by no later than <u>Thursday, October 16, 2025</u>**, a status report concerning how he intends to proceed, including, if appropriate, whether he would like to file an amended Rule 4(c) report and/or whether he is otherwise amenable to informal discussions.

      **IT IS SO ORDERED.**

                        **<u>s/Brian H. Corcoran</u>**
                        Brian H. Corcoran
                        Chief Special Master